**Affirmed and Memorandum Opinion filed April 16, 2015.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-14-00948-CV

---

## IN THE INTEREST OF T.M., A CHILD

---

**On Appeal from the 306th District Court
Galveston County, Texas
Trial Court Cause No. 13-CP-0062**

---

## M E M O R A N D U M   O P I N I O N

A jury found that a father's parental rights to his child should be terminated based on one or more of the Family Code's statutory grounds and that termination was in the child's best interest. In eight issues, the father contends that there was no evidence, or alternatively, insufficient evidence to support the trial court's judgment on the jury's findings. We affirm.

## FACTUAL BACKGROUND

T.M. was born in a Galveston County hospital on November 23, 2012. When T.M. was born, both she and her mother, N.C. ("Mother"), tested positive for the illegal drug phencyclidine, or PCP. T.M. was also diagnosed with Down syndrome, heart problems, and other conditions.

T.M.'s biological father, R.M. ("Father"), was at the hospital when T.M. was born, although he and Mother were no longer in a relationship and Mother was married to another man. Hospital personnel reported that Father came to the hospital smelling of alcohol and verbally abused Mother. Mother identified Father as the biological father of T.M. and Father was listed as such on the hospital's medical records. T.M. also was given Father's last name. Father never questioned that he was T.M.'s biological father.

Due to the positive drug screen and a concern about the possibility of domestic abuse, the Department of Family and Protective Services became involved. With Mother's agreement, the Department arranged for T.M. to be discharged from the hospital to Mother's second cousin, D.H. Father was living in Louisiana at the time and agreed to the placement. The Department did not consider placing T.M. with Father because of concerns about his criminal history and substance abuse. T.M. remained in D.H.'s care until she was returned to Mother on May 28, 2013.

The Department continued to monitor the child's care at Mother's home. In July 2013, about two months after T.M. had been returned to her, Mother failed a drug test. The Department returned T.M. to D.H.'s care, where she has since remained.

In August 2013, the Department filed an "Original Petition for Protection of

a Child, For Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship," listing Mother's husband as T.M.'s presumed father and Father as T.M.'s alleged father. Mediation resulted in agreed temporary orders appointing the Department as T.M.'s temporary managing conservator. Father was also ordered to submit to parentage testing. The Department opted not to offer Father a family service plan until parentage was determined.

Father provided a DNA sample which confirmed that he was T.M.'s biological father, and he was adjudicated as such on January 30, 2014. After that, the Department set up a service plan for Father and delivered a copy of the plan to him on March 1, 2013.

Father's service plan was approved by the court on May 27, 2014. Among other things, the service plan ordered Father to attend, participate in, and complete a psychological evaluation and follow all recommendations; submit to random drug testing; complete a drug and alcohol assessment and follow all recommendations; obtain and maintain gainful employment; pay child support as ordered; enroll and attend a batterer's intervention and prevention ("BIP") program; and not commit any criminal acts. At the time he received the service plan, Father had been convicted of possession of a controlled substance, namely PCP, and was incarcerated in the Galveston County Jail from December 27, 2013, through August 22, 2014.

When the Department's suit went to trial on November 3, 2014, Father had been out of jail for only seventy-three days. Within that time, Father completed a parenting class, submitted to a psychological evaluation, and began a BIP program. Father also voluntarily submitted to a drug treatment program. However, Father admitted using PCP in November shortly before he was incarcerated, using PCP after his release in August, and smoking marijuana in September. Additionally,

3

records showed that Father did not start attending Narcotics Anonymous meetings until October 9, less than a month before trial, and did not begin a clinical detox program until October 24. Father estimated that, as of trial, he had been "clean" for about one month.

Because of his drug use, Father also refused to submit to a court-ordered drug test because he knew he would test positive. The Department deemed the test positive and, as a result, Father was not allowed supervised visitation with T.M. at D.H.'s home. Before that, Father had four visits with T.M.

At trial, the Department sought to terminate the parental rights of both Mother and Father, with the goal of D.H. adopting T.M. The evidence showed that T.M. was living in a safe, healthy, and caring environment with D.H., and that D.H. had allowed Father's family, including Father's three adult children, to visit the child. D.H. testified that she wanted to adopt T.M. so that they could continue their life together. She also stated that she was willing to permit Father's family to continue to see T.M., provided that T.M. was "in a safe place and taken care of." She was also willing to permit Father to visit T.M. so long as he was not abusing drugs.

Father did not dispute that D.H. provided a caring and stable home for the child; in fact, Father agreed that T.M. was well cared for and safe with D.H. Father also believed it would be appropriate for T.M. to remain in D.H.'s care until such time as he was able to provide for her. Father testified that he did not want his parental rights terminated because he wanted to have access to the child and to be able to have a say in the child's life "when [he] bounce[d] back from all this." Father requested that he be made T.M.'s possessory conservator with any restrictions and supervision the court deemed appropriate.

The jury found that both Mother's and Father's parental rights should be

terminated. In accordance with the jury's findings, on November 26, 2014, the trial court ordered their parental rights terminated and appointed the Department permanent sole managing conservator of T.M.[1]

The trial court's judgment recited that Father's parental rights were terminated based on findings that termination was in T.M.'s best interest and that Father committed acts establishing the predicate termination grounds set out in subsections D, E, F, N, O, and P of Texas Family Code section 161.001(1). *See* Tex. Fam. Code §§ 161.001(1)(D), (E), (F), (N), (O) & (P); 161.001(2). The judgment also recited that termination was warranted under Family Code section 161.003. *See id.* § 161.003.

Father filed a motion for new trial challenging the legal and factual sufficiency of the evidence supporting termination, which was overruled by operation of law. He also filed a timely notice of appeal.

### ANALYSIS OF FATHER'S ISSUES

On appeal, Father challenges the legal and factual sufficiency of the evidence supporting each of the termination grounds recited in the judgment and the trial court's finding that termination of Father's parental rights was in T.M.'s best interest. Because we conclude that clear and convincing evidence supports termination based on subsection E of Family Code section 161.001(1) and that termination was in T.M.'s best interest, it is unnecessary to address Father's other issues. *See In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (parental rights can be terminated with a finding best interest of

---

[1] Mother did not appear at trial. The Department sought to terminate Mother's parental rights based on her affidavit of voluntary relinquishment of her rights to T.M. Mother does not appeal the trial court's judgment terminating her parental rights.

the child and any of the section 161.001(1) grounds challenged by appellant, and therefore it is unnecessary to address other grounds).

### *Standards of Review*

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). In Texas, to terminate the parent-child relationship, a trial court must find by clear and convincing evidence that (1) the parent committed one or more of the acts specifically named in section 161.001(1) of the Texas Family Code as grounds for termination, and (2) termination is in the best interest of the child. Tex. Fam. Code § 161.001; *In re U.P.*, 105 S.W.3d at 229. "Clear and convincing evidence" means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. Tex. Fam. Code § 101.007; *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002).

When conducting a legal and factual sufficiency review in a parental-rights termination case, we must determine whether the evidence is such that the fact finder reasonably could have formed a firm belief or conviction that its findings were true. *See In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002); *In re C.H.*, 89 S.W.3d at 25. In reviewing the legal sufficiency of the evidence, we examine all of the evidence in the light most favorable to the fact finder's findings. *In re J.F.C.*, 96 S.W.3d at 266. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that does not support the finding. *Id*. This does not mean, however, that we disregard all evidence that does not support the finding, because disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.*

In reviewing the factual sufficiency of the evidence, we must give due deference to the fact finder's findings and not supplant the judgment with our own. *In re H.R.M.,* 209 S.W.3d 105, 108 (Tex. 2006). We examine all of the evidence, giving due consideration to evidence that the fact finder could have reasonably found to be clear and convincing. *Id.* If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that the fact finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *Id.*; *In re J.F.C.,* 96 S.W.3d at 266.

### Subsection E

Under Family Code section 161.001(1)(E), the trial court may terminate the parent-child relationship if the court finds clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the physical or emotional well-being of the child. Tex. Fam. Code § 161.001(1)(E). The term "endanger" means to expose the child to loss or injury or to jeopardize the child. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Endangering conduct need not be directed at or cause actual injury to the child. *In re U.P.*, 105 S.W.3d at 233. Termination under this subsection must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*; *In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

Father contends that he did not engage in a voluntary, deliberate and conscious course of conduct; rather, his actions, incarcerations, and drug use go to show a diagnosis that with proper treatment will result in a successful parent. Farther points to the results of his psychological evaluation in which the

7

psychologist, Dr. Westhoven, diagnosed him as suffering from antisocial personality disorder and a bipolar disorder, as well as disorders related to his drug use. Dr. Westhoven testified that Father's failure to conform to social norms, impulsivity, irritability, aggressiveness, and disregard for the safety of others was consistent with antisocial personality disorder, and that Father's anger was a characteristic of bipolar disorder.[2] Father suggests that a finding of a deliberate, conscious course of conduct is incompatible with the symptoms of the disorders with which he has been diagnosed, such as impulsivity, and he argues that he is finally receiving some support and help for his problems. Father also argues that T.M. came into the Department's care not because of an act or omission on his part, but as a result of Mother's PCP use, and none of Father's criminal conduct has been against a child.

The Department contends that Father's history of crime, incarceration, and drug use support a finding under subsection E. Although incarceration alone will not support termination, evidence of criminal conduct, convictions, and imprisonment may support a finding of endangerment under subsection E. *See In re A.R.M.*, No. 14-13-01039-CV, 2014 WL 1390285, at *8 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.); *In re C.A.B.*, 289 S.W.3d at 886. Likewise, a history of illegal drug use and drug-related criminal activity is conduct that subjects a child to a life that is uncertain and unstable, endangering her physical and emotional well-being. *In re A.R.M.*, 2014 WL 1390285, at *8; *see In re U.P.*, 105 S.W.3d at 235–36. A father's conduct prior to the establishment of his paternity may be considered as evidence of an endangering course of conduct. *In re A.R.M*, 2014 WL 1390285, at *7.

---

[2] Dr. Westhoven recommended that Father have a psychiatric evaluation to determine whether medication would be helpful, along with therapy, drug treatment, support groups, extended periods of random drug testing, and vocational counseling.

Father has an extensive criminal record starting long before T.M. was born and continuing after her birth. In March 1992, Father was convicted of murder and attempted murder and sentenced to fifteen years in a state jail facility. In 1998, he was also convicted of bribery in Powers County and was sentenced to five years in prison; that sentence was "stacked" onto his concurrent murder and attempted murder sentences. In 2009, Father was convicted of possession of marijuana. In 2010, he was incarcerated for the unlawful carrying of a firearm by a felon. Additionally, as noted above, Father was serving jail time for possession of PCP in 2013 when he was provided with the Department's family service plan.

Some of Father's criminal conduct was the result of domestic abuse against Mother. In July 2010, a protective order was entered on Mother's behalf against Father as a result of an assault for which Father was convicted in October 2010. He was again convicted of assault with family violence in September 2011 for another offense against Mother that occurred in February 2011. Additionally, Father pleaded no contest to, and was convicted of, violating the protective order in June 2012. If a parent abuses the other parent or children, that conduct can support a finding of endangerment even against a child who was not yet born at the time of the conduct. *In re C.A.B.*, 289 S.W.3d at 886; *see also In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("Domestic violence, want of self control, and propensity for violence may be considered as evidence of endangerment.").

Father acknowledged his criminal history and he admitted that he was not around when his other three children were growing up because of his incarcerations. Father also admitted that since 2007, after serving fifteen years for murder, attempted murder, and bribery, there has not been a year in which he has not been incarcerated for one charge or another. Additionally, Father's criminal

behavior continued even after T.M.'s birth with his incarceration for possession of PCP—the same drug that T.M.'s mother used before T.M. was born—and his explanation for possessing the illegal drug was that he was selling drugs at the time. Father also used PCP shortly before going to jail in 2013 and, after his release, used PCP and smoked marijuana. Father admitted that he chose to smoke marijuana even though it would result in preventing him from visiting with T.M. Although Father maintained that he only recently developed substance-abuse problems, Father had previously been convicted of possession of marijuana in 2009, and Dr. Westhoven's psychological evaluation reflected that Father had reported "an extensive history of drug abuse" and noted that he "admitted to being addicted to cocaine, marijuana, and PCP." Father's extensive history of violent crime, imprisonment, and substance abuse both before and after T.M.'s birth demonstrates a course of conduct sufficient to support an endangerment finding.

Additionally, we reject Father's contention that his conduct cannot support termination because it was the result of allegedly treatable psychological disorders. Although mental illness or incompetence of a parent alone are not grounds for terminating the parent-child relationship, a parent's mental state may be considered in determining whether a child is endangered if that mental state allows the parent to engage in conduct that jeopardizes the physical or emotional well-being of the child. *See In re T.G.R.-M.*, 404 S.W.3d 7, 14 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Thus, the jury could have considered Father's mental state when determining whether Father's course of conduct endangered T.M.'s well-being.

The jury also could have discounted Father's argument that he was getting help for his psychological problems and simply needed more time to work on

them, because there was evidence that Father had sought or been ordered to undergo treatment in the past but did not follow through. Dr. Westhoven testified that Father had reported psychological or emotional problems since the murder he committed in 1991, but "he never followed any recommendations to get any kind of psychiatric treatment or medication for those symptoms." The 2010 protective order Mother obtained against Father also ordered Father to complete a BIP program, but Father never sought to comply with that portion of the order. Additionally, Father testified that he attended some Narcotics Anonymous meetings in jail and attended both Narcotics Anonymous and Alcoholics Anonymous meetings after his release, but Father's own documentation of his efforts showed that he waited until the month before trial to begin substance-abuse counseling and treatment. Thus, the jury could have reasonably concluded that Father's mental-health and substance-abuse issues would likely recur and further jeopardize T.M.'s well-being. *See In re R.W.*, 129 S.W.3d 732, 741 (Tex. App.—Fort Worth 2004, pet. denied) ("the jury was not required to ignore a long history of dependency and destructive behavior merely because it allegedly abated before trial"); *In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("[E]vidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue.").

Based on the record before us, we conclude a reasonable fact finder could have formed a firm belief or conviction that Father engaged in conduct that endangered the physical or emotional well-being of T.M. *See, e.g., In re A.R.M.*, 2014 WL 1390285, at *7–9; *In re C.A.B.*, 289 S.W.3d at 886–87. We hold that the evidence supporting termination under Family Code section 161.001(1)(E) is legally and factually sufficient. We overrule Father's second issue.

*Best Interest of the Child*

A strong presumption exists that the best interest of the child is served by keeping the child with its natural parent, and the burden is on DFPS to rebut that presumption. *In re U.P.*, 105 S.W.3d at 230. The factors the trier of fact may use in a termination case to determine the best interest of the child include: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re U.P.*, 105 S.W.3d at 230; *see also* Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating parent's willingness and ability to provide the child with a safe environment).

Father contends that the presumption in his favor is not rebutted because the evidence showed that he visited with T.M. "throughout the case" at D.H.'s home, he has no prior history with the Department, and his children testified favorably concerning his relationship with T.M. and the positive effect the child has had on him. Father suggests that, because D.H. is willing to allow him and his family to continue visiting T.M., Father will have continued interaction with T.M. and, if his rights are not terminated, he may continue to qualify for services and improve such that he will have a positive impact on T.M. Father also contends that he and his family are in a better position than D.H., who was 57 years old at the time of trial, to provide for the care T.M. will continue to need after she turns eighteen. Thus,

12

Father contends, the *Holley* factors weigh in favor of not terminating his parental rights to T.M.

When reviewing the sufficiency of the evidence supporting the best interest finding, evidence proving one or more of the statutory grounds for termination also may be probative in determining that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 28; *In re A.R.M.*, 2014 WL 1390285, at *10. Although Father contends that he is "finally finding out that he needs help and is willing to do it for T.M.'s sake," the jury was entitled to infer from Father's long history of criminal conduct, incarceration, and drug use, as detailed above, that his conduct in the future is unlikely to improve. Additionally, although Father complained that he had insufficient time to comply with all of the requirements of his service plan, he also acknowledged failing to comply with the plan's requirements by taking illegal drugs and refusing the required drug testing, thereby forfeiting his ability to visit T.M.

As support for his parenting abilities, Father points to a portion of Dr. Westhoven's psychiatric evaluation reflecting positively on him, but in the same document Dr. Westhoven ultimately expresses concerns about Father's ability to provide for T.M.'s needs:

> [Father] reported a positive attitude toward parenting and seemed accepting of his daughter's special needs. He expressed a desire to provide and protect her and a willingness to place her needs ahead of his own. [Father] seems to have an understanding of effective parenting strategies and showed maturity in his view of parenting. Significant concerns, however, are raised regarding his ability to provide an appropriate setting for a child, particularly one with special needs, given the personality characteristics and mental health symptoms described above. *If visitation between [Father] and his daughter continues, it is recommended that it remain supervised at all times.* There is concern given the characterological nature of [Father]'s problems, extensive history of substance abuse, and

ongoing criminal history that he may not be able to provide a consistently safe and stable environment for her, regardless of his intentions.

(Emphasis in original). Moreover, Father testified that he was unable to care for T.M. even as of the time of trial, and he expressed satisfaction with T.M.'s current placement with D.H. Instead, Father asked that he be allowed to retain his parental rights while T.M. remained in D.H.'s care until some indefinite time in the future when he would be able to "step up" as a parent. On appeal, Father requests that the court reverse the termination order, appoint the Department sole managing conservator with Father having possessory conservatorship rights, and remand the case to the trial court to assess possession and access schedules for T.M.

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. Tex. Fam. Code § 263.307(a). After T.M. was born in 2012, the Department arranged for D.H. to take T.M. home from the hospital, and T.M. has since spent her entire life in D.H.'s care, with the exception of the two months the child was placed with Mother. D.H. and her own mother care for the child, and D.H. sees that T.M. receives her regular doctor visits and therapy sessions. D.H. testified that, if Father's rights are terminated, she wants to adopt T.M. so that she can continue having the child in her life. D.H. also testified that T.M. calls her "mama" and they have bonded. The Department expressed satisfaction with D.H.'s care of T.M., and even Father acknowledges the evidence shows that D.H. "loves [T.M.], cares for her medical needs and takes excellent care of her." Based on the evidence presented, the jury could have reasonably formed a firm belief or conviction that terminating Father's parental rights was in T.M.'s best interest so that T.M., a special needs child, could promptly achieve permanency in her life through adoption by D.H. *See In re T.G.R.-M.*, 404 S.W.3d at 17; *In re M.G.D.*, 108 S.W.3d at 513–14.

14

Applying the applicable *Holley* factors to the evidence, we conclude that legally and factually sufficient evidence supports the trial court's finding that termination of Father's parental rights was in the best interest of T.M.

## CONCLUSION

Having concluded that the evidence is legally and factually sufficient to support the trial court's findings that Father engaged in conduct which endangered T.M.'s physical or emotional well-being and that the termination of Father's parental rights is in the child's best interest, we affirm the trial court's judgment terminating Father's parental rights to T.M.


/s/     Ken Wise
Justice


Panel consists of Justices Christopher, Donovan, and Wise.

15